UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

CURTIS ANDING                                    *    CIVIL ACTION NO. 3:22-cv-00627
                                                 *
VS                                               *    Judge Shelly D. Dick
                                                 *
ACE AMERICAN INSURANCE,                          *
RUAN TRANSPORT CORPORATION                       *    Magistrate Richard Bourgeois, Jr.
AND CARL A. GREER                                *
*****************************************************************************

### OPPOSITION TO DEFENDANTS' DAUBERT MOTION TO EXCLUDE THE TESTIMONY AND EXPERT REPORT OF MICHAEL GILLEN, AND/OR, IN THE ALTERNATIVE, MOTION IN LIMINE TO LIMIT THE EXPERT REPORT AND TESTIMONY OF MICHAEL GILLEN

Plaintiff, Curtis Anding, submits the instant memorandum in opposition to Defendants' motion in *limine* to exclude the testimony of Mike Gillen. For the reasons set forth in this memorandum, Plaintiff respectfully requests the Defendants' Motion be denied.

### SUMMARY OF THE CASE

As an initial matter, the Plaintiff points out to the Court that this action is nothing more than a simple rear-end motor vehicle crash. In the early morning of February 3, 2022, on LA Hwy 3110 in Natchitoches Parish, Ruan Transport Corporation's 18-wheeler, driven by Carl Greer ("Greer"), crashed into the rear of Curtis Anding's ("Anding") pick-up truck. Greer testified under oath that he was not watching the roadway, and therefore did not see Anding and crashed into the rear of his vehicle.[1] The crash is even recorded on dash cam video.[2] Despite the facts being so simple, the defendants went out and hired an accident reconstruction expert to analyze the dash camera video and give opinions on what the video shows.

---

[1] R. Doc. 55-4, p. 34.
[2] R. Doc. 59.

1

After withholding the video from the Plaintiff for nearly a year and requiring the Plaintiff to file a motion to compel its production with the Court[3], the Plaintiff then hired an accident reconstruction expert, Michael Gillen ("Gillen"), in order to counter the defendants' tactics. The defendants have converted a very simple rear-end motor vehicle crash, which is captured on video, into a dueling expert scenario. As if this waste of resources was not enough, the Defendants have now filed the instant *Daubert* motion and grossly misrepresented to the Court fact, after fact, after fact, which the Plaintiff responds to below.

## LAW AND ARGUMENT

Federal Rule of Evidence article 702 provides the following, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the *proponent* demonstrates to the court that it is more likely than not that:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
**(b)** the testimony is based on sufficient facts or data;
**(c)** the testimony is the product of reliable principles and methods; **and**
**(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."
*(Emphasis added)*

As the Fifth Circuit has held: [W]hen expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is ***reliable*** and ***relevant*** to the facts at issue in the case.[4] *Daubert* went on to make "general observations" intended to guide a district court's evaluation of scientific evidence.[5] The nonexclusive list includes (1) "whether [a theory or technique] can be (and has been) tested," (2) whether it "has been subjected to peer review and

---

[3] R. Doc. 37.
[4] *Thibodeaux v. Equinor USA E & P, Inc.,* No. 22-15-JWD-EWD, 2023 U.S. Dist. LEXIS 115707, at *3 (M.D. La. July 6, 2023), quoting *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[5] *Id.*

publication," (3) the "known or potential rate of error," and (4) the "existence and maintenance of standards controlling the technique's operation," as well as (5) "general acceptance."[6] Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Cases following *Daubert* have expanded upon these factors and explained that *Daubert's* listing is neither all-encompassing nor is every factor required in every case.[7]

### 1.    Gillen took video of the 50 MPH speed limit sign during the site inspection

Defendants repeatedly tell the Court that Gillen used Google Street Views to confirm the posted speed limit was 50 mph and this is not a reliable source.  The Defendants then go on make misleading statements to the Court such as, "………a retained accident reconstructionist, whose office physically conducted a site examination of the accident and could have (and indeed should have) independently confirmed the speed limit through that examination."[8] Defendants make this statement to lead the Court to believe that Gillen's team did not verify the speed limit during the site exam, when the defendants know that Gillen testified that the speed limit was verified at the site exam.

> **Q** So how do you go about making the conclusion or how did Justin go about making the conclusion that it was a speed limit of 50 miles per hour on the date of the accident versus 55?
> **A** I thought that we had gleaned that information from a street view in addition to a site exam. Now, **the site exam showed a speed limit sign**, but I thought that we had something, a Google Street View or perhaps Bing.[9]

---

[6] *Id.*
[7] *General ElectricCo. v. Joiner*, 522 U.S. 136, 142, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); *Thibodeaux v. Equinor USA E & P, Inc.*, No. 22-15-JWD-EWD, 2023 U.S. Dist. LEXIS 115707, at *3 (M.D. La. July 6, 2023); *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).
[8] R. Doc. 54-1, p. 14.
[9] Exhibit A: Gillen's Deposition, page 45, lines 15-23.

3

Even worse, the defendants don't tell the Court that Gillen gave them the video of his site inspection that shows the speed limit sign reading 50 mph.[10],[11]

The Defendants literally devoted an entire section of their brief to argue that Gillen's opinion that the speed limit was 50 mph is unreliable and must be excluded. However, the defendants purposefully fail to advise the Court that Gillen's team took BOTH: (1) a video of the speed limit sign during their site inspection after the accident and (2) obtained Google Street view imagery from before the accident.[12] Both the crash site video (taken after MVA) and the Google Street Imagery (taken before MVA) show that the speed limit sign displays a 50 mph speed limit.[13] Unforgivably, the defendants then fail to inform the Court that their own hired expert, Benjamin Smith, produced an expert report stating that the speed limit was 50 mph.[14],[15]

The drive-through video of the subject crash site clearly shows that the speed limit is 50 mph on Highway 3110. It is nevertheless, common and industry practice for experts to rely on Google Maps or photographs, as evidenced in other cases.[16] Gillen obtained both nonetheless. Thus, the posted speed limit is established by photographic and video evidence showing the speed

---

[10] Exhibit B: Invoice from Gillen listing evidence to be produced in response to Defendants' subpoena duces tecum for his entire file. The list included the NCTI "Drive Through Videos" taken at the site exam.

[11] Defense counsel paid Gillen's invoice and all of the listed evidence was produced. (See Exhibit C: email string regarding the logistics for the evidence production); See also, Exhibit D: FedEx delivery confirmation.

[12] Exhibit E: Still image from the drive through video taken at 1 mins and 23 seconds; Exhibit F: Google Street Imagery.

[13] Exhibit E: Still image from the drive through video taken at 1 mins and 23 seconds; See also Exhibit F: Google Street Imagery; See also R. Doc. 54-1, p.14 (Defendants admit the image is from 2019 and predates the MVA)

[14] Exhibit G: Ben Smith Report, p. 9.

[15] In being candid with the Court, Plaintiff points out to the Court that Ben Smith lists the speed limit as 50 mph in his expert report. However, during his deposition Smith states that he is just going to stick with what is listed on the crash report.

[16] *Baugh v. Voyager Indem. Ins. Co.*, No. 19-14275, 2020 U.S. Dist. LEXIS 248639, at *11 n.51 (E.D. La. Nov. 30, 2020); *Dennis v. Collins*, 2017 U.S. Dist. LEXIS 37614, 2017 WL 1017422 (W.D. La. Mar. 15, 2017) (expert relied on Google Maps information in gathering information about an accident scene); *Federal Deposit Insurance Corp. v. RBS Securities, Inc.*, 2019 U.S. Dist. LEXIS 51067, 2019 WL 1396752 at *10 (W.D. Tex. Mar. 26, 2019) (expert opinion deemed reliable when expert relied on Google Earth photographs, among other considerations).

limit was the same both before and after the accident. This entire argument is without merit and a waste of both of the parties' time as well as the Court's time.

## 2.  <u>Gillen opines that his inspection of Anding's taillights and brake lights was inconclusive</u>

To be clear, Gillen has very clearly testified that his inspection of the taillights and brake lights was inconclusive, and that he "could not tell one way or the other", whether Anding's taillights were working.[17] Gillen did give the opinion that he believes Anding's left blinker was on at the time of the accident but admits that he is unable to determine whether any other lights were working or not.[18]

Gillen has explained that the left brake light was heavily damaged upon inspection but showed indications of hot shock—meaning it was illuminated at the time of the crash.[19] This opinion is supported by the dash-cam video of the subject wreck, which showed Anding's left blinker illuminated at the time of impact.[20] And as Gillen explained, Anding's brake light shares a filament, meaning that when the turn signal is engaged, the brake light is essentially flashing:

> **Q** The brake lights on the left and right of the truck are not illuminated. Correct?
> **A** I can't tell. I can't see a light on the right side of the truck in the video. I can see a light on the left side in the video. But your brake light and your turn signal would <u>share a filament</u>. **So your brake light, when you apply the turn signal on the left side, you're basically flashing what would be the brake light on the left side.**[21]

Defendants contend that Gillen failed to address whether the bulbs are part of a one filament or two filament system. Defendants must have not read Gillen's deposition before asserting this argument because Gillen expressly told Defendants that the light shares a filament, rendering this argument completely baseless.[22]

---

[17] Exhibit A: Gillen's Deposition, pages 40-41
[18] *Id.*
[19] Exhibit H: Gillen's Expert Report, page 16.
[20] R. Doc.59 (Dash-cam video of the wreck).
[21] Exhibit A: Gillen's Deposition, page 41, lines 19-25; page 42, lines 1-2.
[22] Exhibit A: Gillen's Deposition, page 41, lines 19-25; page 42, lines 1-2.

Nevertheless, since there was an indication of left brake light hot shock upon vehicle inspection, and since the dash-cam video shows an illuminated left turn signal light, Gillen reasonably concluded that the left brake light bulb was working at the time of impact, in the form of the left blinker flashing.[23] Even the Defendants own expert acknowledges Gillen's opinion on the filament analysis:

> Q Okay. Was there any physical evidence that you all uncovered during that inspection that you felt like was evidence that could have gone either way?
> A No, but like I said, it's my opinion that he did have his blinker on for a short period of time. So, you know, **Mr. Gillen could be correct about that one filament, but that would make sense on some level with my analysis.**[24]

Next, regarding the right brake light and the top-mounted brake light, Gillen concluded that neither showed signs of hot shock, rendering both "inconclusive" as to whether Anding's right and top-mounted lights were illuminated at the time of the wreck.[25] Thus, Gillen is not offering an opinion on the illumination of the right and top-mounted lights, yet Defendants argue that Gillen's "inconclusive" opinion on both is improper. Notably, Benjamin Smith came to the same conclusion as Gillen regarding the right and top-mounted lights.[26] So, both experts generally agree that the inspection of the taillights and brake lights was inconclusive, and therefore they are unable to have an opinion.[27]  This section of the Defendants' brief argues about an issue that Gillen is not even advancing an opinion.

### 3.  <u>Michael Gillen's expert report</u>

Gillen is the President and owner of National Collision Technologies, Inc., ("NCTI") a

---

[23] Exhibit L:  Northwestern University, Traffic Accident Reconstruction textbook, page 436-463.  Plaintiff cites this authoritative source as the defendants argued that no source was provided as the basis for Gillen's inspection of the bulbs.
[24] Exhibit I: Benjamin Smith Deposition, page 26, lines 10-19.
[25] Exhibit H: Gillen's Expert Report, pages 17-18.
[26] Exhibit I: Benjamin Smith Deposition, page 24, lines 16-17.
[27] Exhibit H: Gillen's Expert Report, pages 16-19; Exhibit I: Benjamin Smith Deposition, page 24, lines 16-17.

Louisiana-based corporation, founded in 1993.[28]  NCTI conducts technical investigations and reconstructs traffic collisions on a full-time basis.  Gillen has been investigating traffic collisions since 1977 and performing formal accident reconstructions since 1991. *Id.*  His training in the discipline of traffic accident reconstruction consists of over one thousand hours of formal tested courses.[29] *Id.*

Prior to founding NCTI, Gillen was the founder and Supervisor of the Baton Rouge City Police Traffic Homicide Unit. He was responsible for the on-scene investigation and reconstruction of all critical injury and fatal collisions for the purpose of determining criminal negligence and providing expert testimony.  To date, Gillen has investigated over two thousand traffic collisions and has conducted formal reconstructions of over two thousand additional collisions.  He has provided expert testimony in over four hundred and fifty cases and qualified as an expert in accident reconstruction and/or rules of the road in Local, District, Military and Federal courts in Louisiana and Mississippi—including the Middle District of Louisiana.[30]

Michael Gillen was hired by Plaintiff to serve as his accident reconstruction expert.  Gillen has been the captain of the ship for every facet of the accident reconstruction work up in this case, making all the decisions, judgement calls, conclusions, etc., and has simply delegated legwork, assignments, physical tasks, etc., to employees that work for him at his company.[31]  Much like an attorney/judge's interaction with their law clerk, when they provide the instructions and guidance to the law clerk, in order for research and writing to be performed.  Typically, the attorney/judge will meet with the law clerks, review the issues at hand, delegate assignments, instruct what additional information and research is needed, etc.  The attorney/judge will then periodically meet

---

[28] Exhibit J: Michael Gillen Affidavit.
[29] *Id.*
[30] *Id.*
[31] Exhibit J: Michael Gillen Affidavit.

7

with the law clerk and review their progress on the assignments, analyze the information/law they gathered, review drafts of motions, briefs, opinions put together by the lawclerk, and give them additional direction based on the attorney/judge's interpretation and analysis of the information in front of them.   Ultimately, the motion/brief or the Court's ruling/opinion is that of the attorney/judge, not the law clerk. The law clerk simply performed all of the legwork and tasks assigned by the attorney/judge.  This is precisely what took place in the instant case with Michael Gillen, and his accident reconstruction work up, analysis, and report.

In the instant case, Gillen's deposition testimony is filled with evidence establishing his active and substantial participation in preparing his expert report. Defendants' motion repeatedly mischaracterizes the factual case work up conducted by Gillen and his team, by taking statements out of context and then omitting Gillen's essential testimony that contradicts the defendants' desired narrative.

When confronted with the question as to who participated in preparing the report, Gillen explained:

> **Q** In a prior deposition, you told me that your typical protocol in your office is that a technician prepares the report and then you edit. Is that correct?
> **A** Sure. It's kind of a team effort. The same thing happened in this. The boilerplate, if you will, was prepared. The technician who is assigned to the file is preparing a draft. He and I meet periodically during the case work-up, if you will, and then he submits a draft report to me.
> **Q** But in this particular case, you told me that the technicians went out on August the 8th of 2023. Walk me through how it works in your office. When would be the first time you would be involved in looking at any of the evidence for this case?
> **A** Well, when we're hired. As soon as the file material is presented to us by whoever has hired us, I meet with the case manager to review the file, and then it's assigned to a technician. The technician is given various tasks, and as those are done, the technician meets with me. And from that, we just develop additional task lists until we -- such as in this case, we were given instructions to issue a report.[32]

---

[32] Exhibit A: Gillen's Deposition, page 18, lines 2-25.

Although Gillen may delegate tasks to his employees, such as preparing the boilerplate material for his report or gathering information, each aspect in generating Gillen's expert report is done at Gillen's direction and with his oversight.[33] Nevertheless, Defendants cite a string of cases arguing that Gillen's report was "*wholly* ghost-written by his technicians" and must be excluded. Specifically, Defendants cite a fragmented, and extremely misleading quote from *Batiste*, as follows:

> "[a]s stated in *Batiste v. Lewis*, to prove ghost-writing, the moving party must show **that a third party**, here Mr. Gillen's technicians, '*provided the substance of the opinions of the testifying expert, not just editorial assistance.*'"[34]

However, *Lewis* does not stand for this contention whatsoever. Rather, in *Lewis*, the Court stated, "[t]o prove ghostwriting, the party seeking exclusion must use the available documents to show that the non-moving **party** provided the substance of the opinions of the testifying expert, not just editorial assistance."[35] The court in *Lewis* did exclude the plaintiff's expert's testimony because the plaintiff himself conducted all of the analysis in the expert's report, *not* the expert's employees or assistants.[36] Contrary to *Lewis,* Curtis Anding did not take part in Gillen's accident reconstruction work up or report in any fashion whatsoever. Rather, Gillen and his employees did everything from start to finish. It is common practice for a company to utilize its employees to perform tasks in the course of employment and there is nothing improper about same.

Converse to Defendants' unrelated citations, Plaintiff points the Court to *Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*[37], which is directly on point with the instant case. In

---

[33] Exhibit J: Michael Gillen Affidavit.
[34] *Emphasis added.*
[35] Batiste v. Lewis, No. 17-4435, 2019 U.S. Dist. LEXIS 61605, at *6 (E.D. La. Apr. 10, 2019), quoting *Transcon. Gas Pipeline Corp.*, 2007 U.S. Dist. LEXIS 67691, at *10-11 (citations and alterations omitted); see also *United States ex rel. Wall*, 319 F.R.D. at 510; *Seahorn Invs.*, 2015 U.S. Dist. LEXIS 120662, at *26.
[36] *Batiste v. Lewis*, No. 17-4435, 2019 U.S. Dist. LEXIS 61605, at *10 (E.D. La. Apr. 10, 2019).
[37] *Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, No. 06-4262, 2009 U.S. Dist. LEXIS 132828, at *5-6 (E.D. La. July 28, 2009).

9

*Imperial*, the Defendant attempted to exclude the Plaintiff's engineering expert's testimony under Rule 26 on the grounds that he did not write his expert report or do the investigation reflected in the report.[38] However, as the Court found, the engineer's expert report was prepared in a collaborative effort between himself and his employee.[39] The Louisiana Eastern District Court denied the Defendant's Daubert motion, holding that Rule 26 "does not prohibit collaboration in the preparation of an expert report."[40]

The Court also distinguished the circumstances under Rule 26 when counsel helps generate the expert report, as compared to when the expert's employees help generate the report: "The Advisory Committee Notes accompanying Rule 26 expressly allow *counsel* to provide limited assistance in the preparation of an expert report. Fed. R. Civ. P. 26(a)(2)(B) advisory committee's notes."[41] "The Advisory Committee Notes are silent, however, on assistance provided by individuals other than counsel, such as an employee of the expert witness or an outside consultant hired by the expert himself."[42] "Federal Rule of Evidence 703 is clear that experts are not required to prepare all the documents that support an opinion as long as the information is of the type reasonably relied on by experts in his field."[43]

---

[38] *Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, No. 06-4262, 2009 U.S. Dist. LEXIS 132828, at *5-6 (E.D. La. July 28, 2009), citing Federal Rule of Civil Procedure 26(a)(2)(B).
[39] *Id.*
[40] *Id.*
[41] *Id. Emphasis added.*
[42] *Id.*
[43] *Id,* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000)("[A]n expert may rely on data that [he] did not personally collect."); *In re James Assocs.*, 965 F.2d 160, 172 (7th Cir. 1992)("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him.")

Here, this case is no different. Gillen's expert report was prepared in a collaborative effort between himself, Justin Templet, Wesley D'aquin, and Grace Jones. It was not, however, prepared by Plaintiff's counsel, as Defendants suggest by citing *Batiste* to support their ill-founded ghost-writing arguments. All of the opinions and conclusions contained in Gillen's expert report are Gillen's, not those of his employees.[44] All of Gillen's work in the instant case, including the drafting of the expert report, was done in a manner that is customary and accepted within Gillen's field.[45]

4. **The materials review, site inspection, and vehicle inspection were performed at Gillen's instruction to locate information and evidence that Gillen determined was needed for his accident reconstruction.**

When Gillen is hired in any given case, he schedules a meeting with his employees to discuss the case and delegate tasks that he wants completed. Typically, the meeting involves Gillen, the case manager, and the technician assigned to the file, and Gillen subsequently assigns the technician with various tasks.[46] In this case, the case manager was Justin Templet, who is a mechanical engineering graduate, who has also completed all of the accident reconstruction foundation courses from Northwestern Traffic Institution.[47] One of the assigned technicians was Wesley D'aquin, who has an Industrial Technology degree, and who has also completed the Northwestern Traffic Institute foundation courses in Accident Reconstruction.[48] The other was an intern, Grace Jones, who is an engineering student at Louisiana State University.[49]

At this initial meeting Gillen assigned certain tasks for his employees to gather information and evidence that Gillen deemed pertinent and necessary for the accident reconstruction.[50] Such

---

[44] Exhibit J:  Michael Gillen's Affidavit
[45] *Id.*
[46] Exhibit A: Gillen's Deposition, page 18, lines 12-25.
[47] Exhibit A: Gillen's Deposition, page 19, lines 4-10; Exhibit J: Michael Gillen Affidavit.
[48] Exhibit A: Gillen's Deposition, page 13, lines 9-17; Exhibit J: Michael Gillen Affidavit.
[49] Exhibit A: Gillen's Deposition, page 13, lines 19-20; Exhibit J: Michael Gillen Affidavit.
[50] Exhibit J: Michael Gillen Affidavit.

tasks included to review all the information in the file provided by the retaining attorney, and then to meet with Gillen to discuss same.[51] Thereafter, Gillen directed the technicians to conduct a site examination of the subject crash site and a vehicle exam.[52] After the site inspection and vehicle exam, Gillen met with the technicians in sit-down meetings to review photographs, video, and information gathered from the exams.[53]

No, Gillen did not personally inspect each page of the material, nor did he personally perform the site or vehicle inspection himself—he is not required to do so. He did, however, direct the technicians to review and summarize the information, and then Gillen personally met with the technicians and personally reviewed and verified the information and evidence that he deemed pertinent to his analysis.[54] He also directed the technicians to gather certain evidence/information from the crash scene and during vehicle exam, and subsequently met with the technicians to review and verify the evidence gathered.[55] Although Gillen did not perform every aspect of these processes by himself, he nevertheless directed, controlled, supervised, and verified every aspect and conducted approximately 18 team meetings during the case.[56] Gillen had his finger on the pulse throughout the process by overseeing the technicians' work and consistently meeting with the technicians after each task and reviewing and verifying the work performed and evidence gathered.[57] The delegation of such legwork is very common within his expertise, as is the case with most professionals.[58]

---

[51] Exhibit A: Gillen's Deposition, page 19, lines 21-24; Exhibit J: Michael Gillen Affidavit.
[52] Exhibit A: Gillen's Deposition, page 20, lines 24-25; page 21, lines 1-2; Exhibit J: Michael Gillen Affidavit.
[53] Exhibit A: Gillen's Deposition, page 21, lines 4-6; Exhibit J: Michael Gillen Affidavit.
[54] Exhibit J: Michael Gillen Affidavit.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] Exhibit J: Michael Gillen Affidavit.

5. **The Lytx dash-cam video analysis**

Next, Defendants advised the Court that Gillen did not perform a frame-by-frame analysis of the dash-cam video and therefore his analysis is flawed. As with many other parts of the Defendants' motion, this is not accurate and is a gross misrepresentation to the Court. The Defendants well know that Gillen undertook a frame-by-frame analysis because his expert report specifically states this fact.

Gillen's expert report, page 20, contains a section labeled **"VIDEO ANALYSIS".** This section begins by explaining that *"NCTI determined the video recorded at approximately 10 frames per second which was used to analyze the vehicle's movement prior to the point of impact."*[59] This video analysis section then goes on to explain and reference image after image, documenting which frame each image represents and the analysis being undertaken.[60] Gillen even produced a supporting exhibit with his expert report labeled "Calculations summary", the last two pages of which are a spreadsheet showing his calculations from the frame by frame analysis.[61]

Gillen and defense counsel also discussed during his deposition that he has several programs that allow him to do a frame-by-frame analysis and he wasn't sure which one they used and he would need to check to confirm. Defense counsel then discussed with Gillen who was involved in performing the frame-by-frame analysis—plainly demonstrating that the Defendants were aware that a frame-by-frame analysis took place.[62] Despite all these facts existing, the Defendants continue to advance arguments that are contrary to reality.

If this was not enough, the Defendants then tell the Court that Gillen did not know who performed the analysis of the video, when such a statement is patently false. Specifically,

---

[59] Exhibit H: Gillen's Expert Report, page 20
[60] Exhibit H: Gillen's Expert Report, page 20-24
[61] Exhibit K: Calculations Summary.
[62] Exhibit A: Gillen's Deposition, page 26, lines 14-16.

Defendants tell the Court in (R. Doc. 54-1, p. 9), that "When asked who performed the video analysis, Mr. Gillen responded, **I really don't know**." That is not a true representation of his testimony at all. In fact, Gillen's testimony was actually the opposite of "I really don't know". Specifically, Gillen's testimony was:

> **Q** All right. After the scene investigation, what was done next?
> **A** Well, aside from meeting with me, somewhere along the line, there was an analysis of the video, the dash cam video from the 18-wheeler, and that was kind of an ongoing process.
> **Q** Who performed the analysis of the video?
> **A** Well, that would have been Wesley, Justin, and myself. Grace may have participated in that. I really don't know.
> **Q** Did y'all do that together, or was it done separately?
> **A** Well, I would have met with Justin and Wesley. I don't know if Grace worked on it with them independent of me or independently. Grace has been working on some video files for us. I don't know that she did that on this one or not.[63]

Whether Defendants intentionally or mistakenly misinterpreted Gillen's testimony, the clear reading of his above deposition testimony identifies that Gillen does know who performed the analysis: Gillen, Wesley, and Justin performed the analysis of the video. The only thing that Gillen does not know is whether Grace participated in the analysis of the video.

Further into his deposition, Gillen even conducts a live, two-and-a-half-page analysis[64] of the subject crash video, in which he describes the video findings. In doing so, Gillen testified that he incorporated pertinent still images from the frame-by-frame analysis into his report.[65] The report even references which frame is being analyzed.

Defendants also complain that Gillen's use of the Lytx dash-cam video to obtain deceleration data, braking information, g forces, and distance was improper. Nevertheless, as

---

[63] Exhibit A: Gillen's Deposition, page 22, lines 1-17.
[64] Exhibit A: Gillen's Deposition, page 23, lines 17-25; page 24-25; page 26, lines 1-4.
[65] Exhibit A: Gillen's Deposition, page 23, lines 21-23.

Gillen explained, he routinely reviews and analyzes videos of traffic accidents and the video in the instant case had all the data needed to perform the video analysis and calculations for the wreck:

> **Q** What training do you have in video analysis?
> **A** I don't know that I have any formal training in video analysis. This is something that we routinely review, whether it's security camera footage, dash cam footage. If you're able to capture values from the video, from that point, it's simply a matter of applying those values to the accepted accident reconstruction equations that are taught by Northwestern Traffic Institute, IPTM, and Texas A&M. You're simply taking the information that's being provided and plugging those variables in to conduct calculations. It could be something as simple -- I think you were involved in a case where we had a gas station video of a vehicle traveling down the roadway and we captured landmarks from that video, and then based on the period of time it took the vehicle to travel between those landmarks, we were able to calculate a speed. In this case, the speed was actually displayed on the video, and the time was displayed on the video. And from that, we were able to confirm the braking rates that were displayed on the video through calculations.[66]

The Lytx video produced in discovery likewise demonstrated that there was no significant lag for the data, as the moment of impact between the two vehicles registers a significant change in velocity of the vehicle within 1/10 of a second.[67]  Simply put, since the Lytx dash-cam video produced by the defendants provided on screen vehicle speeds and braking values, Gillen was able to utilize this data and confirm same through mathematical equations.

The Defendants just omitted Gillen's explanations from their briefing because it killed their narrative and their motion as a whole.  Gillen produced his calculations to the defendants[68] and when asked, Gillen thoroughly explained the calculations, and how he reached such conclusions.

---

[66] Exhibit A: Gillen's Deposition, page 27, lines 2-25; page 28, lines 1-3; See also Exhibit K:  Calculations Summary.

[67] Exhibit H: Gillen's Expert Report, page 24, figure 37, shows the vehicles deceleration rate jump by 1g at the time of impact at the +1.9 sec time stamp; Defense expert Smith also agrees that the impact occurred at +1.8 and +1.9 sec time stamps (See Exhibit G: Benjamin Smith Expert Report, page 17.)   See Also, Exhibit J:  Michael Gillen's Affidavit.

[68] Exhibit K:  Calculations Summary.

As stated very simply by Gillen, he was provided with the necessary variables to conduct the calculations from the Lytx dash-cam video:

> **Q** What calculations were performed to calculate the speeds involved, if any?
> **A** Well, the speeds are displayed on the video itself as well as the GPS coordinates that were provided to us independent of the Lytx system. At some point prior to this collision, your driver, I think he was gonna 65 miles per hour. But it was not a matter of calculating the speed. We worked with the time values that were displayed on the system, and we worked with the speed displayed on the system to calculate his braking distance, and again, we confirmed the braking rate that was shown on the display on the video through calculations.
> **Q** Explain to me how that was done.
> **A** Well, if you have an initial speed and an ending speed and a time value, from that, you can calculate a distance. If you have a -- had we known a distance and an initial speed and an ending speed, you can calculate a braking rate. The system gave us a starting speed of 55, an ending speed at impact of 35, and a time value of 2.5 seconds. And from that, you calculate a braking distance of 160 feet.[69]
>
> …
>
> **Q** What was the breaking value that was applied to Mr. Greer's tractor-trailer?
> **A** I think it came out to .35. We use a braking factor versus an acceleration rate. It's expressed in percentages of G's.
> **Q** And how is that determined?
> **A** It's calculated from the average braking rate experienced going from 55 down to 35 within the two and a half seconds. It was also consistent with the displays on the bottom of the screen that varied. Some of them were .3. Some of them were .4. There was a variation of those display rates on the screen itself, but on average, they came out to about a .35.[70]

Gillen then went on to explain how his analysis and calculations were consistent with the literature on heavy truck's braking abilities, explaining that:

> "Due to the construction of heavy truck tires, heavy trucks typically brake at a rate of approximately 75% of the available surface friction. The typical surface friction of a wet roadway is 0.5g, 75% of which would be 0.375g. Mr. Greer's braking is consistent with nearly full braking indicating that Mr. Greer has perceived Mr. Anding's vehicle ahead of him and has begun an avoidance attempt by braking."[71]

---

[69] Exhibit A: Gillen's Deposition, page 29, lines 13-25; page 30, lines 1-11.
[70] Exhibit A: Gillen's Deposition, page 30, lines 16-25; page 31, lines 1-4.
[71] Exhibit H: Gillen's Expert Report, page 21.

Thus, the dash cam video, on-screen data, and authoritative literature all support that Greer slammed on his brakes and was achieving essentially maximum braking for his vehicle.

The Defendants then make one additional argument that is flat out incredible. Defendants argue that Gillen's opinion is "completely flawed in logic" because he concludes that the reason Greer slammed on his brakes is because he saw the stopped Anding vehicle in the road. Specifically, Gillen opined that, because Greer applied his brakes, he must have perceived Anding's vehicle. As quoted directly above, Gillen explained: "Mr. Greer's braking is consistent with nearly full braking indicating that Mr. Greer has perceived Mr. Anding's vehicle ahead of him and has begun an avoidance attempt by braking."[72]

Now, Carl Greer has testified in this case that he was not watching the roadway at the time of the wreck, and that had he not taken his eyes off of the road, he would have stopped his vehicle and been able to avoid the crash.[73] Greer also testified that no matter what was in the road, he could not have stopped for it because he was blinded by lights and was not looking at the road.[74] Greer, the defendant driver himself, has judicially admitted this is his position and the Plaintiff has therefore filed a motion for summary judgment on liability. Based on Greer's testimony, it is unclear why he is braking and crossing the center line, but it is clear that the Plaintiff is entitled to summary judgment on liability.

Conversely, both accident reconstruction experts in this case, Gillen and Smith, agree that Greer's braking is consistent with Greer perceiving Anding's vehicle in the road.[75] Both experts also share the following opinions regarding Greer's braking:

---

[72] Exhibit H: Gillen's Expert Report, page 21.
[73] R. Doc.55-4, p. 7-8 (Deposition of Carl Greer)
[74] R. Doc.55-4, p. 9 (Deposition of Carl Greer)
[75] Exhibit H: Gillen's Expert Report, page 21; Exhibit G: Benjamin Smith Expert Report, page 15.

1) In response to perceiving Anding's vehicle, Greer began braking at the -0.6sec and -0.7sec time stamps.[76]

2) Greer applied heavy braking 2.5sec before impacting the rear of Anding's vehicle.[77]

3) Greer impacted Anding's vehicle between the +1.8 and +1.9 sec time stamps.[78]

In other words, Greer is driving down Highway 3110 at 55 mph, suddenly slams on his brakes, and starts to drift across the center-line. At the same time, there is also a stopped pick-up truck in the highway (Anding). The question is: *Why did Greer slam on his brakes and drift across the center line?* Gillen and Smith opine, more likely than not, Greer slammed on his brakes because he saw Anding's vehicle in the road.

The Defendants now tell the Court that such a conclusion and opinion is "completely flawed in logic", despite the fact that all of the above data values and times are displayed on their own dash camera video that the defendants produced in discovery.

The reality of the situation is that both experts' opinions are contrary to Greer's sworn testimony. The experts both concluded that in response to perceiving Anding's vehicle, Greer began braking between the -0.6sec and -0.7sec time stamps. However, Greer says he wasn't watching the road and was blinded.[79] Regardless of whether the experts' opinions or Greer's testimony is true, it does not negate the undisputed fact that Greer began braking at a certain point (2.5sec before impact).

Furthermore, regardless of which is true, it does not change Gillen's Calculations and opinion that Greer's braking rate was .35g, which is approximately 75% of the available surface friction (0.375g). This figure comes directly from Northwestern University Traffic Crash

---

[76] Exhibit H: Gillen's Expert Report, page 21; Exhibit G: Benjamin Smith Expert Report, page 15.
[77] Exhibit H: Gillen's Expert Report, page 21; Exhibit G: Benjamin Smith Expert Report, page 14.
[78] Exhibit H: Gillen's Expert Report, page 24; Exhibit G: Benjamin Smith Expert Report, page 17.
[79] R. Doc.55-4, p. 7-8 (Deposition of Carl Greer)

Reconstruction, and supports Gillen's conclusion that "heavy trucks typically brake at a rate of approximately 75% of the available surface friction."[80]. The Defendants had every opportunity to challenge Gillen's reliance on the 0.35g brake rate value if they wanted to, but instead decided to not even question Gillen in his deposition as to the source of this information. The defendants cannot now complain that they don't know why Gillen used that value when they did not question same when they had the opportunity.

**6. <u>Gillen utilized the IDRR software to compare hypothetical scenarios with the known data</u>**

As expressly stated by Gillen in his deposition, he did not rely on IDRR.[81] Nevertheless, Defendants devote approximately five pages of their motion arguing that Gillen improperly used IDRR. As Gillen testified, IDRR is a computer program that is a database of various studies that allows you to enter hypothetical scenarios/conditions for an accident and it will give you a compilation of studies and data.[82] However, Gillen testified that he did not rely on IDRR because he had the actual video from the dash-cam of Greer's vehicle.[83]

Gillen did, however, run several different hypothetical scenarios through IDRR in order to analyze Greers ability to avoid the subject crash under a range of different perceived reaction time ("PRT") values. To test Greer's ability to avoid the crash, Gillen compared the fastest PRT value to a "common" PRT value:

> A . . . And then we applied a perception-reaction time in advance of the brake lag. We ranged that from a very rapid PRT, perception-reaction, of **seven-tenths** of a second, which was a low-end value that came from IDRR, the same program that Ben Smith has used to develop a much longer PRT. **And we also used a two-second PRT, which is kind of a common value for a nighttime perception-reaction.**[84]

---

[80] Exhibit L: According to Northwestern University, Traffic Accident Reconstruction textbook, page 535 "For wet road conditions, the truck tire is predicted to be about 70-80% of the passenger car tire on the same wet road conditions"
[81] Exhibit A: Gillen's Deposition, page 36, lines 23-23.
[82] Exhibit A: Gillen's Deposition, page 36, lines 6-21.
[83] Exhibit A: Gillen's Deposition, page 25, lines 16-25.
[84] Exhibit A: Gillen's Deposition, page 25, lines 1-10.

In other words, Gillen introduced numerous different variables into the program in order to obtain the fastest PRT time they could generate using the IDRR program. In order to determine the fastest PRT time that could be generated by IDRR, Gillen used several different scenarios, such as "at an intersection" and "with brake lights on."[85] Gillen found that the fastest PRT value from IDRR under several hypothetical situations was 0.7sec. Gillen then also evaluated the PRT value of 2.0sec, which was derived from Northwestern University Center for Public Safety's Guidelines.[86] Gillen refers to the 2.0sec PRT as a "normal PRT" in his report.[87]

Gillen then looked into Greer's vehicle positioning on the roadway under both scenarios: the fastest PRT he could generate in IDRR (0.7sec); and the normal nighttime PRT (2.0sec) given by Northwestern. In other words, Gillen only used the IDRR PRT value (0.7sec) to test if Greer could have avoided the subject wreck, if his reaction time was off the charts, given how fast Greer was driving. The answer to this question being, no, Greer could not have stopped even under the hypothetical IDRR "rapid" 0.7sec PRT value due to his speed.

Defendants spend a large amount of time arguing about whether the wreck occurred at an "intersection" under the IDRR definitions by solely citing Smith's opinion piece as authority to explain "according to the IDRR program's definition of intersection, the subject-accident did not occur at an intersection." However, defendants completely miss the point of the exercise.

---

[85] Exhibit K: Gillen's Calculation Summary Sheet.
[86] *Id*, Fricke, L. and Baker, J. S. (2010). "Chapter 7: Perception and Reaction in Traffic Crashes" *Traffic Crash Reconstruction,* 2nd Edition. Northwestern University Center for Public Safety. Evanston, Il. Pages 187-200
[87] Exhibit B: Gillen's Expert Report, page 24, ("It is generally accepted that the typical time for someone to perceive and react (PRT) to a normal anticipated event is 1.5sec. Unexpected or more complex events generally require more time to process and due to a reduction in contrast values and overall visibility during darkness, the PRT value may be 2.0sec or greater.")

20

As explained by Gillen, it is evident that he did not rely on IDRR and only utilized IDRR to determine the fastest possible PRT value the program could generate in order for Gillen to undertake an avoidance analysis.

**7. 0.5sec Brake lag is the generally accepted value within the accident reconstruction field**

Defendants next attack Gillen's use of 0.5sec brake lag in his expert report. In his deposition, Gillen explained 0.5sec is the generally accepted value for brake lag time:

> A . . . The mechanical brake lag time for the air brake system, we used a value of a half a second. I think Ben Smith, your expert, has used a value of .625 or something. We're not gonna argue over a tenth of a second, but **it's always been my understanding that the half-second is the accepted value for a brake lag time.**[88]

On the second page of Gillen's expert report, he cites the Northwestern University Traffic Crash Reconstruction, which is precisely the source of the generally accepted brake lag value of 0.5sec.[89]

Not to mention, when the Defendants' expert, Benjamin Smith, was questioned in his deposition about brake lag values, he stated that "there is no reason to get that granular" in regard to slightly differing brake lag values:

> **Q** So is that input value for an airbrake system the same across the board regardless of what airbrake system a tractor trailer is equipped with?
> **A** No, I've done testing with these things before and taken courses on this. It's all within 50 milliseconds, typically.
> **Q** Okay. So it would be, you know, anywhere from like 575 to 675?
> **A** Yeah, I mean it's, we're talking about milliseconds, so.
> **Q** I understand.
> **A** Yeah, you could add or subtract.
> **Q** All right.
> **A** It really comes down to individual characteristics on tractors, and in most cases, there's no reason to get that granular.[90]

---

[88] Exhibit A: Gillen's Deposition, page 24, lines 20-25, page 25, line 1.
[89] Exhibit L: According to Northwestern University, Traffic Accident Reconstruction textbook, page 596 "A brake lag time of one-half second is most commonly used by crash reconstructionists"
[90] Exhibit I: Benjamin Smith Deposition, page 58, lines 7-24.

The Defendants did in fact have the opportunity to challenge Gillen's reliance on a 0.5sec brake lag value, but did not once even attempt to question Gillen throughout his deposition as to the source of the 0.5sec brake lag value. Just because Defendants failed to ask Gillen the source of the relied upon for the brake lag value does not equate to Gillen's analysis being unreliable.

**8.    Benjamin Smith's affidavit is a non-authoritative and unsupported opinion piece**

Throughout Defendants' motion, Benjamin Smith's affidavit is repeatedly cited suggesting that it is an authoritative source in the field of accident reconstruction. However, Smith's affidavit is merely an opinion piece written solely in connection with Defendants' motion that utterly fails to cite even one generally accepted authoritative source. Smith's affidavit is nothing more than an opinionated disagreement with Gillen and his reconstruction of this accident.   Although Defendants purport Smith's affidavit to be authoritative, Gillen's career and experience in the field of accident reconstruction is approximately 25 years longer than Benajmin Smith's and is far more extensive.

Gillen has investigated over two thousand traffic collisions and has conducted formal reconstructions of over two thousand additional collisions.  He has provided expert testimony in over four hundred and fifty cases and qualified as an expert in accident reconstruction and/or rules of the road in Local, District, Military and Federal courts in Louisiana and Mississippi—including the Middle District of Louisiana.[91]  The mere fact that Benjamin Smith may disagree with Gillen does not call Gillen's expertise and methods into question.

**9.    Gillen is permitted to discuss driving standards, traffic laws, and guidelines**

Gillen is not offering any legal opinion at the trial of this matter.  The speed limit on the road is a fact, not an opinion.  The training and instruction given to Greer that is found in Ruan's

---

[91] Exhibit J: Michael Gillen Affidavit.

Transportation's Driver Study Guide is a fact, not an opinion. The Federal Motor Carrier Safety Administration's, Commercial Driver's license Manuals', the Commercial Vehicle Preventable Accident Manual's all provide rules, training, advisories, instructions, etc., and it is a fact that such rules exist, that is not an opinion.

Now, Gillen will be giving an expert opinion at trial on whether this crash was avoidable and whether Greer's compliance/non-compliance with such laws, rules, advisories, training, etc. play a role into this accident occurring. This is squarely within Gillen's expertise. Gillen's 20 years with the Baton Rouge City Police Department where his primary assignment was with the traffic division where enforcement activities resulted in the issuance of over 25,000 citations for moving violations also gives him a unique experience and perspective.

According to Federal Rule of Evidence 704, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Gillen has investigated over two thousand traffic collisions and has conducted formal reconstructions of over two thousand additional collisions. He is particularly qualified to opine that a driver, such as Greer, failed to follow certain guidelines, training, advisories, or traffic statutes, and just because it embraces an ultimate issue in the case does not justify its exclusion.[92]

As this Court is aware, in virtually every single personal injury trial, medical doctors provide expert testimony on medical causation. The ultimate issue to be decided by the jury is whether an event caused injury to the plaintiff. Without fail, in such cases medical expert witnesses give opinions on whether the accident caused the injury. Gillen's testimony is no different just because it happens to be on a liability issue as opposed to a damage issue. Federal Rule of Evidence

---

[92] USCS Fed Rules Evid R 704.

704 is unequivocal that Gillen's testimony is not objectionable solely because it embraces the issue of liability.

Last, La. RS 32:304 requires taillights to be plainly visible from a distance of one thousand feet to the rear. In providing a hypothetical example of Anding only having one taillight illuminated, Gillen analyzed Greer's ability to avoid the crash at one-half of the taillight requirement in La. RS 32:304, meaning that Anding's taillight would hypothetically be visible from 500 feet. Gillen was very clear in his deposition when asked his reason in citing La. RS 32:304 in his report:

> A That's purely a hypothetical. We're considering that as a one-half reduction of what you would normally have from two taillights. But even at that reduced distance of 500 feet, all we're showing is that, mathematically, Mr. Greer had enough time and distance to control his vehicle and stop without running into the rear of the vehicle. . .[93]
>
> …
>
> That's simply a hypothetical. If you -- if you cut the visibility in half, based on the assumption that you're getting 1000 feet from two tail lights, you cut it in half. Even at that, the accident would have been avoidable by Mr. Greer.[94]

If Gillen somehow did not already make this issue crystal clear, Gillen is not offering an opinion in this instance; rather, he created a hypothetical situation to discuss whether Greer could avoid an accident if he was only able to see taillights from a 500 foot distance—that is it.  In other words, La. RS 32:304 was simply referenced to discuss a hypothetical variable used in Gillen's example. He does not intend to and will not be asked to give an opinion or conclusion on how far Anding's lights were visible on the roadway.

---

[93] Exhibit A: Gillen's Deposition, page 38, lines 5-12.
[94] Exhibit A: Gillen's Deposition, page 38, lines 19-24.

## CONCLUSION

For the reasons noted herein, Curtis Anding respectfully requests for this Honorable Court to deny Defendants' *Daubert* motion to exclude the testimony of Michael Gillen.

Respectfully Submitted,

**GORDON MCKERNAN INJURY ATTORNEYS**

/s/ RICHARD F. ZIMMERMAN, III
RICHARD F. ZIMMERMAN, III (#31374)
5656 Hilton Avenue
Baton Rouge, Louisiana 70808
Phone: (225) 388-3115
Facsimile: (225) 228-2893
Email: Richard@getgordon.com

*And*

**CLAYTON, FRUGÉ & WARD**
A.M. "Tony" Clayton (#21191)
Michael P. Frugé (#26287)
3741 La. Highway 1 South
Port Allen, Louisiana 70767
Telephone: (225) 344-7000
Facsimile: (225) 383-7631
Email: michaelfruge@claytonfrugelaw.com
*Attorneys for Plaintiff, Curtis Anding*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was served upon all known counsel of record by electronic transmission on this 7th day of March, 2024.

/s/ RICHARD F. ZIMMERMAN, III
Richard F. Zimmerman, III

25